### In re HANDY–ANDY STORES OF LOUIS-IANA, Inc.

#### No. 3800.

District Court, W. D. Louisiana, Shreveport Division.

Feb. 16, 1931.

T. Overton Brooks and Wm. H. Cook, both of Shreveport, La., for trustee.

Robt. J. O'Neal, of Shreveport, La., for Thos. C. Anthony.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, La., for First Nat. Bank.

DAWKINS, J.

This matter comes before the court upon a petition of the trustee to superintend and revise the ruling of the referee sustaining the claim of the First National Bank of Shreveport to a chattel mortgage lien upon all of the fixtures in the stores operated by the bankrupt. The trustee and a creditor opposed the lien as invalid under the provisions of Act 270 of the Louisiana Legislature of 1926.

I adopt, as part of my findings of fact, those facts found by the referee, as follows:

"It appears from the record that the bankrupt wished to borrow the sum of $15,-000.00, and it procured the services of Mr. J. H. Brown, President of Hicks Company, Ltd., at that time a creditor, to assist in obtaining the loan. Mr. Brown interviewed Mr. Andrew Querbes, President of the First National Bank, and made known the fact that Handy-Andy Community Stores of Louisiana, Inc., wished to borrow $15,000.00. Mr. Querbes advised that he would not make the loan unless Mr. Brown guaranteed its payment, and suggested that Mr. Brown obtain a chattel mortgage covering the fixtures located as his security if he became guarantor. Mr. Brown then consulted the officers of the bankrupt corporation and advised them of the conditions upon which the loan could be obtained, which they accepted. He then returned and discussed the matter further with Mr. Querbes, who agreed to make the loan. Mr. Querbes then turned the matter of detail over to Mr. McPherson, Assistant Vice-President. The loan was made in the following manner:

"On February 20th, 1929, a chattel mortgage covering all of the fixtures of bankrupt to secure a note of $15,000.00 was executed in favor of Mr. McPherson; this note was delivered to J. H. Brown, whereupon he executed his promissory note, payable to the Bank, for the sum of $15,000.00, to which he attached as a pledge the $15,000.00 mortgage note as collateral. Mr. McPherson gave his personal check for $15,000.00 to the bankrupt. The Bank gave to Mr. J. H. Brown the proceeds from the $15,000.00 note and Mr. Brown in turn gave to Mr. McPherson this same money, which McPherson deposited in his personal account to meet the $15,000.00 check which he had given to the bankrupt.

"Through this circuitous route $15,-000.00 of the Bank's money went into the hands of Handy-Andy Community Stores of Louisiana, Inc., passing first to Brown, then to McPherson and from McPherson to bankrupt.

"As stated above, the Bank first proved its claim as owner of the mortgage note, but at a hearing counsel for the bank moved to have the claim corrected to show the Bank a pledgee of the note. Counsel explained that in making up the proof of debt he had misunderstood the real conditions, and had assumed that the Bank was the owner, but later learned that it was the pledgee of the mortgage note.

"It is admitted by all parties that no effort was made to comply with the provisions of Act 270 of 1926 which relates to the Bulk Sales Law.

"Between February 21st, 1929 and February 26th, 1929, practically all of the funds derived from this loan were disbursed to various creditors of bankrupt. Some were paid in full, while others were only partially paid. A number of creditors were paid nothing.

"On April 8th, 1929, the estate of Handy-Andy Community Stores of Louisiana, Inc., was placed in the hands of a Receiver in the state Court. The property covered by the mortgage, which was located in Caddo Parish, was sold, along with other assets, by the Receiver in the State Court, and it is admitted that the amount received from the sale of the mortgaged property was Six Thousand Nine Hundred Fourteen and 66/100 ($6,-914.66) Dollars.

"Later, the fixtures located in the bankrupt's store at Plain Dealing, Bossier Parish, Louisiana, were sold by order of the Bankruptcy Court, but the right to the proceeds of this sale will be treated in a separate opinion. No further reference will be made to that claim in the present opinion."

The act in question is what is known as

the Bulk Sales Law of the state, enacted for the purpose of preventing fraud, and to protect creditors against a transfer, through sale, mortgage, etc., of the stock and fixtures of a merchant in bulk, and out of the usual course of business.

Section 1 declares that the "transfer in bulk, and otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the transferor" of the stock, fixtures, etc. * * * "shall be void as against the creditors of the transferor, unless made in conformity with the provisions of this Act."

Section 2 requires the making of a full, detailed inventory, at least ten days "before the completion of any such transfer, or the payment of any consideration therefor," and that the transferee shall demand and receive from the transferor a sworn written statement, giving the names and addresses of all creditors so shown, who shall be notified, either personally or by registered mail, of the "terms of the proposed transfer, the consideration to be paid therefor, the time set for the transfer of said property, the terms and conditions of such sale, and a copy of the statement of creditors hereinabove provided for."

Section 3 makes a transferee who fails to comply with the foregoing requirements liable to creditors "as receiver for the fair value of all of the property so transferred to him * * *, provided further, that no proceeding at law or in equity shall be brought against the transferor to invalidate any such transfer after the expiration of ninety days from the consummation thereof."

Section 4 provides penalties for the transferor who makes false statements in such transfer.

Section 5 is quoted in full, as follows: "That transfers under this Act shall include transfers in payment of debt, in whole or in part, pledges, mortgages, sales, exchanges, and assignments, whether for cash or on credit or in exchange for certificates of stock, bonds or other obligations of a corporation, otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the transferor, but nothing contained in this Act shall apply to transfers made by executors, administrators, receivers, or assignees under voluntary assignments for the benefit of creditors, trustees in bankruptcy or sales under judicial process."

Section 6 permits the transferor to require security of the transferee as a protection against creditors; and section 7 pro-

vides penalties for persons who fraudulently obtain information as to the business of others for the purpose of exposing or injuring them, and section 8 declares that property transferred in violation of this act shall be subject to attachment; while section 9 provides that if any portion of the act is held unconstitutional, it shall not affect what remains; and section 10 merely repeals all laws in conflict with the act under consideration.

Further supplementing the findings of fact by the referee, the record shows that at the time Mr. J. H. Brown, president of the Hicks Company, approached the president of the First National Bank, for the purpose of negotiating a loan for the bankrupt, the Hicks Company was a creditor to the extent of $8,000, and, in the discussion, submitted to the bank a financial statement of the Handy-Andy Community Company, showing the following:

### Assets.

| | |
|---|---:|
| Cash on hand in Bank | $ 254 75 |
| Accounts Receivable | 2,333 63 |
| Notes Receivable | 12,857 51 |
| Merchandise (Inventory) | 22,861 22 |
| Fixtures & Delivery Equipment | 37,961 83 |
| Meter Deposits | 56 00 |
| Franchise (Ark., La. & Miss.) | 100,000 00 |
| Franchise Stores | 13,200 00 |
| | $189,524 94 |

### Liabilities.

| | | |
|---|---:|---:|
| Accounts Payable | | $ 17,445 91 |
| Notes Payable | | 6,193 18 |
| W. A. W. & J. B. T. | | 20,000 00 |
| Surplus | | 8,090 85 |
| Capital Stock | $145,380 00 | |
| Less Resale Stock | 7,590 00 | 137,790 00 |
| | | $189,524 94 |

The business of the bankrupt was that of a retail grocer, operated on the cash and carry plan, and from this statement it appeared that the tangible assets, consisting of stock and fixtures, were appraised at $61,074.09, as against which there were accounts and notes of $43,644.09. More than half of these assets, or $37,961.83, was represented by the fixtures, which, every one knows, possessed that value to the particular business only so long as it was a going concern, and that in event of the necessity for enforcing the chattel mortgage thereon, the same would be worth, or there could be realized therefrom, only a fraction of this amount, besides putting the concern out of business. The indebtedness on notes and open accounts exceeded the value of the merchandise by $982.87, not including $20,000 due to two of the stockholders, hereinafter mentioned. Accounts and notes receivable totaled $15,197.14, but in the nature of things, one dealing with the Handy-Andy Company, could not

have placed any great reliance upon them as assets. There appeared on the statement items of "Franchises" and "Franchise Stores," of $113,000, but these too were necessarily of doubtful value, and apparently very much exaggerated. So that both Brown, on behalf of his company, and the president of the bank, were made fully aware of the condition of the business of the bankrupt, in so far as it was reflected by this statement, before anything was done toward executing the chattel mortgage. Realizing this precarious nature of the undertaking, the bank, with due conservatism, declined to make the loan, unless it was guaranteed by the Hicks Company, who, as before stated, was a large creditor, in fact the largest of the bankrupt.

After authorizing the loan, on condition that the Hicks Company would guarantee it, the details of completing the matter were, by the president of the bank, turned over to one of its junior officers, Mr. Roy B. McPherson, an assistant vice-president. The chattel mortgage was then drawn in the latter's favor as an individual, the mortgage note was made payable to the maker's own order, and was used as collateral for a principal note given by the Hicks Company. McPherson then gave the bankrupt his own check for $15,000, and deposited the proceeds of the loan made to the Hicks Company to his own account to meet this check. It was cashed or deposited to the account of the bankrupt. The mortgage was passed February 20th, and the first check drawn against this deposit was on the following day, in favor of the Hicks Company for $7,000; thereafter, between Feb. 21st and 26th, all of the remainder of these funds were paid out to creditors, including additional checks on February 23d and 26th in favor of the Hicks Company for $1,183.88 and $271.07, respectively, which settled its account in full, while only partial payments were made to the other creditors. These checks were all drawn on and paid by the First National Bank, the claimant herein. Before completing the loan, two of the stockholders, W. A. Wilcox and J. B. Taylor, were required to give to McPherson, mortgagee in the chattel mortgage and the officer of the bank intrusted with the handling of the transaction, a letter as follows:

"Shreveport, Louisiana, February 20, 1929.
"Mr. R. B. McPherson, Shreveport, Louisiana.
"Dear sir: You have this day purchased from the Handy Andy Community Stores of Louisiana, Inc., a note for $15,000.00, repayable in monthly instalments of $500.00 each and due six months after date, which is secured by chattel mortgage covering all of the furniture, fixtures and equipment of the corporation in its six stores in Shreveport and Plain Dealing, Louisiana. We are the principal stockholders and managing officers of the corporation. The corporation owes us $20,000.00, and one of the considerations for your purchasing this note was our agreement with you that we, as individual creditors of said corporation, should agree to subordinate our claim for said $20,000.00 to yours for $15,000.00 in respect of all assets of the corporation of whatsoever nature and kind, including as well those covered as those not covered by the mortgage which secures your note, and that in the event of insolvency or liquidation, your note aforesaid shall be paid as between you and us by preference and priority over our claim. It was further agreed that, in the event of bankruptcy, we will file our claim for the above amount, and that any amounts paid to us in liquidation of said claim shall, so far as may be necessary, be applied upon the note this day purchased by you, and we agree to make proper assignment thereof, should the same become necessary.

"We write you this letter for the purpose of verifying our verbal agreement, and if the above is in accordance with your understanding thereof, please indicate the same by signing your name on the space provided therefor below.

"Yours very truly,
"[signed]    W. A. Wilcox.
"J. B. Taylor.
"Accepted: February —, 1929.
"_____."

This proposition was formally accepted by McPherson.

Simultaneously with the execution of the mortgage, the following agreement between the bankrupt and Brown, and others representing the Hicks Company, was entered into:

"State of Louisiana, Parish of Caddo.

"This Agreement entered into on the 20th day of February, 1929, by and between W. A. Wilcox, J. B. Taylor, O. H. Jordan, C. A. Tolar, and Handy Andy Community Stores of Louisiana, Inc., herein represented by W. A. Wilcox, its president, hereinafter referred to as First Parties, and J. H. Brown, hereinafter referred to as Second Party, Witnesseth:

"Whereas, Second Party has this day secured for the Handy Andy Community Stores of Louisiana, Inc., a loan of $15,000.-

00, secured by chattel mortgage on the furniture, fixtures and equipment of the company in its six stores in Shreveport and Plain Dealing, Louisiana, and has personally guaranteed that said note will be extended from time to time as long as the control of the corporation remains as presently vested, and as long as the monthly installments of $500.00 a month and accruals of interest shall be paid, as long as the corporation operates at a profit and maintains its present, or better, financial status; and,

"Whereas, the First Parties own a majority of the common stock of the corporation, and desire to guarantee to the said Second Party that the control of the corporation will be maintained in the present management, in accordance with one of his requirements upon the execution of said guarantee.

"Now, therefore, the parties hereto have contracted and agreed, and do by this act, and these presents contract and agree to and with each other in the manner following, to-wit:

"1–Each of the First Parties has this day endorsed, deposited with and pledged to Second Party the number of shares of stock of said corporation set opposite his or its name below, to-wit:

| Name | No. of Shares. |
|---|---|
| W. A. Wilcox and J. B. Taylor | 1985 |
| O. H. Jordan | 90 |
| C. A. Tolar | 10 |
| Handy-Andy Community Stores of Louisiana, Inc. | 916 |
| Treasury Stock | |

"2–The First Parties consent and agree that the said stock shall remain so pledged to the Second Party until the full and final liquidation of the note and mortgage aforesaid, and it is hereby agreed that at all future meetings of the stockholders of said corporation the stock of the individual stockholders hereby pledged shall be voted by the respective owners thereof and Second Party, jointly, and that the treasury stock hereby pledged shall be voted by the Second Party, individually, if the same become necessary to accomplish the purposes hereof.

"3–The guarantee executed by the Second Party having been signed by him and The Hicks Company, Ltd., it is agreed that in case of the death of the said Second Party, The Hicks Company, Ltd., shall designate one of its officers to act in the place and stead of said Second Party.

"4–Upon the repayment of the loan aforesaid, Second Party shall deliver to each of the parties hereto the respective certificates representing the shares this day pledged to him.

"In Witness of the Above Agreements, this instrument is signed by the parties, in the presence of subscribing competent witnesses, on the date first above written."
"_____
"Handy-Andy Community Stores of La., Inc.
"By _____, President.
"_____."

This document gave the Hicks Company, Limited, through assignment of a majority of the stock, control of the corporate affairs of the company, as a further security for its becoming responsible to the bank for the indebtedness created by the chattel mortgage.

It thus appears, at least in so far as the Hicks Company was concerned, the transaction was quite unique, in fact extraordinary to such an extent, that at least as to it, no one could deny its unusual character or contend that it was in the ordinary course of business of the Handy-Andy Company. All of the above circumstances, with the possible exception of the assignment of a majority of the stock to Brown, were made known to either the president of the bank, who was informed of the financial condition of the Handy-Andy Company, or to McPherson, to whom, as an officer of the bank, the details of completing the transaction were committed. Of course in an ordinary banking transaction, the bank would not be affected by undisclosed facts and circumstances as between the Hicks Company and the bankrupt, but, in my opinion, the bank was necessarily charged with knowledge of information received through its officers, to wit, that the mortgage was being taken upon all the fixtures of a business consisting of some half dozen units, that it had creditors whose claims in notes and accounts aggregated $23,644.09, and that the bankrupt had other creditors, consisting of two of its stockholders, who had subordinated their claims to the extent of $20,000 to the rights of the Hicks Company for guaranteeing the loan to be paid at the rate of $500 every six months over a period of thirty months, whereas the mortgage note itself was payable in six months.

■ Under such circumstances, I do not think that, even as to the bank, it could be said that the giving of the chattel mortgage was in the usual course of business, but on the contrary, it was highly unusual, and that institution was necessarily charged with knowledge of the facts which would invalidate this lien as to creditors, if act 270 of 1926 is applicable. I am not unmindful of the fact that testimony of the witnesses in this case has been to the effect that the sole object of

the representative of the Hicks Company, in doing what it did, was to aid a customer in carrying on its business, yet I must assume that experienced men like these witnesses were aware of the precarious nature of the undertaking, and then, too, there is the significant circumstance that the Hicks Company was the largest creditor and received all of its money.

It is contended by the bank that the statute known as the Bulk Sales Act, was intended to affect transfers only, and that under the law of this state a mortgage does not constitute a conveyance either of title or possession of property. The title of the act declares that its object is "To prescribe the form and to regulate the manner in which the transfer and sale in bulk out of the usual course of business of a stock of goods, wares, merchandise and fixtures and transfers in payment of debt in whole or in part, pledges, *mortgages*, sales, exchanges and assignments shall be made, and excepting certain transfers from the application of this act * * * ; to define certain misdemeanors in trade and commerce relating to bulk sales, and to prescribe penalties for the violation thereof; to define and prescribe the civil effects resulting from transfers of personal property in bulk in violation of this act, and to generally regulate the sale of personal property transferred in bulk and otherwise than in the usual course of business or trade. * * *" (Italics by the writer of this opinion.) This title is somewhat confused in that at the beginning its purpose is stated to be to "Prescribe the form and to regulate the manner in which the *transfer and sale* in bulk out of the usual course of business of a stock," etc., but adds "and transfers in payment of debt in whole or in part, pledges, *mortgages,* sales, [etc.], shall be made." From which it might be inferred that it would also prescribe the form and regulate the manner of executing "transfers in payment of debt * * *, pledges, mortgages, sales," etc. (Italics by writer of this opinion.) However, in so far as sales are concerned, they had already been covered in the first clause; but in the omnibus clause near the end of the title its purpose is declared to be "and to generally regulate the sale of personal property transferred in bulk and otherwise than in the ordinary course of business. * * *" The first section of the act declares "That the transfer in bulk, and otherwise than in the ordinary course of trade and in regular and usual prosecution of the business of the transferor * * * shall be void as against the creditors of the

transferor, unless made in conformity with the provisions of this Act." It will be noted that pledges, mortgages, etc., are not mentioned, except they be embraced in the term "transfer." Then again, subparagraph (a) of section 2, prescribes what the "transferor" and "transferee" shall do as to listing and inventorying the property; subparagraph (b), that the "transferor" shall demand and receive of the "transferee" certain information in writing; the form of the affidavit to be made by the "transferror or agent" is prescribed, and subparagraph (c) requires the "transferee" to notify the creditors of the "transferor" as to the terms, condition, etc., of such sale. Section 3, prescribing liability for failure to comply with the act, uses similar terms to designate the transferor and transferee, as does section 4, prescribing penalties. Finally, section 5 above quoted in full, declares "that transfers under this Act shall include * * * pledges, *mortgages,* sales [etc.] * * * otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the transferor." Of course, in all of these terms except mortgage, as legally defined by our law, such as pledges, sales, exchanges, and assignments, there is an actual transfer, either of the possession or title to the property, but neither in the case of a chattel mortgage nor mortgage upon real estate, is there such a transfer. Hence, if we accepted these terms under their ordinary meaning in law there would be nothing to place a mortgage within the class of a transfer, other than the statement in section 5 of this act, which declares that "Transfers * * * shall include * * * mortgages." However, we must assume that the Legislature knew the law of the state, as I have outlined it, and I know of no reason why it could not, by clear provision to that effect, declare, for the purposes of this particular statute, that a mortgage should constitute a transfer, if it were given "otherwise than in the ordinary course of trade and in the regular and usual prosecution of the business of the transferor." Is it possible to conceive of a merchant mortgaging in bulk his stock or his fixtures in the usual course of his business? Of course he could sell his stock over the counter, pledge notes of his customers for money borrowed, exchange portions of his stock or fixtures for articles of similar character, but could not sell "in bulk * * * or transfer * * *" in the ordinary course of business, large portions of his stock of goods to persons for resale where he was only a retailer, as here, or "all or substantially all of the fixtures or

equipment," in any case, for this would have the effect, practically, of terminating the business, which is not ordinary or usual. He might, if it was customary in his line of business, exchange his merchandise for that of a similar nature, but I take it could not convey any considerable part of it for diamonds, corporate stock, etc., if this could not be considered usual in the particular trade in which he was engaged. While it is hard to conceive of any instance in which a merchant could mortgage "any portion" of his stock in the usual course of trade, or any substantial part of his fixtures, except to secure the purchase price, it seems reasonably certain that he could not mortgage the whole of either in any circumstances, without contravening the provisions of this statute, the plain purpose of which was to protect the creditors, whose rights existed at the time of such a transaction, without either giving to some of them a preference or receiving cash therefor to be spent for his own personal needs, or in paying some of his creditors to the prejudice of others, as was done in this case. Of course he might use the funds to purchase additional stock also, but, in the present case, it was the declared purpose throughout the negotiations to use the money to pay debts, and it was so used.

In view of all that has thus been said, I cannot see how it is possible to hold the statute inapplicable to chattel mortgages without eliminating section 5 therefrom.

Counsel for the bank have cited several cases from other states holding that chattel mortgages will not be interpreted as transfers under bulk sales statutes; but so far as I have been able to find, none of them involve the express provision of the Louisiana act, declaring that transfers thereunder, shall "include mortgages." Hence, in those cases, it was a matter of judicial interpretation as to whether mortgages were included. In this state, however, the Legislature has left nothing to construction, but has itself said that a mortgage given "otherwise than in the regular and usual prosecution of the business," shall have the same effect as a sale or other transfer, when considered under the statute now in question.

As stated by counsel for the bank, this is perhaps the first time that the courts have been called upon to construe this provision of Act No. 270 of 1926, when applied to chattel mortgages. The last preceding law upon the subject of sales in bulk, was Act No. 114 of 1912, entitled "An Act to Amend and Re-Enact Act No. 166 of 1894, as Amended and Re-Enacted by Act No. 94 of 1896." Section 4 of the Act of 1912 (which statute also dealt with other matters in trade) is as follows: "Be it further enacted, etc., That the sale, in bulk, out of the usual course of business, of a stock of goods, wares or merchandise, in whole or in part, by the seller or vendor, shall be prima facie fraudulent and void as against the creditors of the vendor, unless the vendor or transferor and purchaser or transferee shall, make a true and faithful inventory, showing the quantity and, so far as possible, with the exercise of reasonable diligence, the cost price to the vendor or the then market value of each article to be included in the sale; and unless the purchaser or transferee demand and receive from the vendor or transferor a written list of the names and addresses of the creditors of the vendor or transferor, with the amount of indebtedness due and owing to each and certified by the vendor or transferor, under oath, to be a full, accurate and complete list of his creditors and of his indebtedness; and unless the purchaser or transferee shall, at least five days before taking possession of such merchandise or paying therefor, notify personally or by registered mail every creditor whose name and address are stated in said list, or of which he has knowledge, of the proposed sale and of the price thereof; and unless the purchaser or transferee shall preserve such inventory and sworn list of creditors for inspection by the creditors, or any of them, for forty-five days after the completion of the sale."

Section 4 of the Act of 1896 simply made one who knowingly purchased "in block" goods, wares, etc., unpaid for without exacting a sworn statement that they had been paid for, guilty of a misdemeanor, while act 166 of 1894 made no reference whatever to the purchase and sale of goods in bulk.

It is true that the act of 1926 does not refer to the preceding statutes just mentioned, but I think the three should be considered together, as indicating the gradual development of the policy of the state in dealing with the difficulties sought to be overcome; and if the Legislature has placed an unnecessarily harsh burden upon business, it is not for the courts to question that course. The law should be applied according to its fair meaning, and the matter of amelioration left to the law-making body.

Counsel also urge that if the act of 1926 is given the interpretation contended for by the trustee, it would have the effect of regulating chattel mortgages, a purpose other

than a transfer out of the usual course of business, and hence attribute to it two objects in violation of the state Constitution. However, I cannot see that any such result would follow. The Legislature, as before stated, must be presumed to have taken into consideration the chattel mortgage law (Act No. 198 of 1918), and if it had intended to exclude mortgages of that character from the operation of the act of 1926, this would have been done in no uncertain language. In fact, chattel mortgages are about the only kind that can be given upon the species of property covered by the statute in question. It expressly repeals all laws or parts of laws "contrary to or in conflict or inconsistent with the provisions of this Act. * * *" Both it and the chattel mortgage act are laws of a general nature, as distinguished from special enactments, and I think may be interpreted together, notwithstanding the view I have expressed above. Chattel mortgages may still be given upon any chattel, but in dealing with merchants, where the transaction is out of the usual course of business of that class, then the mortgagee and mortgagor must conform to the act of 1926, and all other transactions are unaffected thereby. This holding allows those who wish to give and accept chattel mortgages the right to do so, upon compliance, in the case of merchants, with the Bulk Sales Law, and at the same time affords the protection which the latter act was intended to give to creditors.

Counsel for the bank have also urged that if the chattel mortgage is ineffective because of the act of 1926, that result can redound only to the benefit of those creditors who were such before it was given, and the bank should be subrogated under the law of the state and in equity to the rights of the creditors whose claims were paid with the funds loaned. However, the act declares that the failure to comply with it, in those cases to which it is applicable, shall make the attempted transfer "void as against the creditors of the transferor. * * *" A similar provision in the act of 1912 has been construed as follows: "To sell or buy a stock of goods, in violation of section 4 of the act, invalidates the sale instead of creating it. Omission on the part of the seller or purchaser to comply with the requirements of this section is clearly a fault or wrong, which carries with it not only the nullity of the sale as a fraudulent transaction, but also imposes upon the purchaser the penalty of personal liability, under section 6 of the act, for the goods coming into his possession by virtue of such sale or fraudulent

act, to which the purchaser is a party." Rosenberg & Sons v. Waguespack, 167 La. 451, 119 So. 423, 425.

Hence, as to creditors, the transaction being void, it could create no rights in those who acted in violation of the statute. See, also, Kline et al. v. Sims et al., 149 Miss. 154, 114 So. 871.

It appears from the evidence that the very purpose of handling the mortgage in the name of McPherson, in the manner as was done, was to avoid upsetting the bankrupt's business and creating suspicion in the minds of creditors and other firms doing business with the Handy-Andy Company, which it was feared would result, if it became known that the Hicks Company was the one actually making or guaranteeing the loan. The result was to permit a seriously embarrassed business to continue and to induce others to become creditors, who, had they known the true situation, would probably not have done so. Of course, if the chattel mortgage had been valid and was recorded, they would be charged with knowledge of its existence, whether they actually knew it or not; but in view of the unusual circumstances of this case, I am of the opinion that it would have the effect of a legal, if not an actual, fraud, upon their rights to permit the bank to come ahead of them upon the proceeds of the fixtures. See Kline et al. v. Sims et al., supra. Then again, I think, stripped of all matters of form, this loan was in reality made to the bankrupt by the Hicks Company with money which it borrowed from the bank, and the consequences of holding the mortgage invalid as to other creditors will be to place upon it the necessity of paying the obligation. There appears to be no question but that the bank had no interest of its own in the matter other than to accommodate its customer, the Hicks Company, and I do not think there was any intention on the part of the bank to prejudice the other creditors, but in view of the knowledge which was brought home to it of the whole matter and the method used by the Hicks Company to carry it through, I think the effect is to invalidate the mortgage in its hands.

The bank has also plead the prescription of ninety days provided in section 3 of Act 270 of 1926. However, the chattel mortgage was dated February 20, 1929, and the petition for adjudicating the Handy-Andy Company a bankrupt was filed on April 22 of the same year, or within sixty-one days. Bankruptcy was resisted by the defendant,

and some fifty other persons alleging themselves to be creditors intervened and joined in the demand that there be no adjudication, among them being Roy B. McPherson, the mortgagee, who was then claiming to be a creditor for $15,000, and numerous other creditors who were among those receiving payment out of the funds which had been realized from the loan now under consideration. Defendant was finally adjudged a bankrupt on June 20, 1929. The rights of all parties are determined as of the date of the filing of the petition for adjudication, whether voluntary or involuntary. Collier on Bankruptcy, (13th Ed.) vol. 1, pp. 657, 658, et seq., and authorities in foot notes. If prescription has not run at that time for or against the bankrupt, the provisions of both state and federal statutes are superseded by paragraph d of section 11 of the Bankruptcy Act, 11 USCA § 29 (d) itself. See same authority, vol. 1, p. 425 et seq., and authorities cited. So that I am of the view that the ninety-day provision of section 3 of Act 270 of 1926, of the state ceased to apply from the date of the filing of the petition, and the trustee had the time allowed by section 11 of the Bankruptcy Act (11 USCA § 29) in which to make an attack upon the mortgage.

■ Counsel for the bank also contend that the relief sought by the trustee, in opposition to its claim, could only be had in a plenary action, and cannot be asserted against its alleged lien under the chattel mortgage. However, section 57 of the Bankruptcy Act (11 USCA § 93) seems to me to cover the matter fully. See, also, Collier, vol. 1, p. 1171. In the present case, the property or its proceeds is in the custody of the trustee, and the matter involves the allowance of the claim as a secured one, of which in the first instance the referee had jurisdiction, subject to review by the court. I also think that the court has full power to review the whole case and is not restricted by the findings of the referee either as to fact or law. See, also, Id. p. 1171 et seq.; In re Pettingill & Co. (C. C. A.) 137 F. 840, 842, from which I quote, as follows: "Neither, according to the usual practice, are the proceedings before the referee brought before the court on exceptions, and thus made a part of the record, as in the case of a master in chancery. The relations between the court and the referee are usually of an informal character. Section 38 of the act of July 1, 1898, c. 541, 30 Stat. 555 (U. S. Comp. Stat. 1901, p. 3435 [11 USCA § 66]), and general order 27 (89 F. xi; 32 C. C. A. xxvii [11 USCA § 53]), provide for review by the court of the orders of referees in the most general terms, and are far from limiting the court to the rules which govern a chancery suit. Therefore, according to the common practice, the District Court was authorized to disregard the findings of the referee entirely, if it saw fit so to do, and proceed de novo, or reject them for reasons of law, or refuse to accept them in whole or in part, without assigning reasons therefor. The position of the petitioner in this particular would require this court to be bound conclusively by the findings by the referee of the preliminary and ultimate facts, although the District Court was not so bound, a proposition which defeats itself on its very face."

■ I am of the opinion further that the trustee was the proper party to contest the allowance of this lien, and the matter is reviewed on that basis. Collier, vol. 2, pp. 1568 and 1574.

For the reasons assigned, the ruling of the referee will be set aside, and the claim of the First National Bank to a lien upon the proceeds of the fixtures will be disallowed. Proper decree may be presented. The rights of all parties are reserved.